**In the Matter of the ESTATE OF Darlene J. NEUMAN, Deceased**

**and**

**In the Matter of the Estate of Lois Jeannette Wiggs, Deceased.**

**No. A11–1695.**

Court of Appeals of Minnesota.

Aug. 6, 2012.

Donald Chance Mark, Jr., Alyson M. Palmer, David M. Ness, Fafinski Mark & Johnson, P.A., Eden Prairie, MN, for appellant Elizabeth Sietsema.

Earl H. Cohen, Steven V. Rose, Emeric J. Dwyer, Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, for respondents Estate of Darlene J. Neuman, Estate of Lois Jeannette Wiggs, and Friends of Animal Adoptions, Inc., d/b/a Animal Ark No–Kill Shelter.

Norman M. Abramson, Sheryl G. Morrison, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for respondent University of Minnesota Foundation.

Considered and decided by ROSS, Presiding Judge; WRIGHT, Judge; and TOUSSAINT, Judge.[*]

## OPINION

ROSS, Judge.

This case arises from the pilfering of funds from two estates. The owner of a small promotional business and his office manager became the attorneys-in-fact for an elderly woman, and, after her death, they became the personal representatives of her estate. The business owner overcharged the estate $151,519 for personal services and personal-representative fees. He had also been the personal representative of the estate of the woman's housemate, who had predeceased her. Acting as one estate's personal representative, the business owner gave his office manager a $5,000 "gift" from the estate. This appeal concerns the liability of the office manager, Elizabeth Sietsema, whom the district court held jointly and severally liable for the overcharges and the "gift." Sietsema appeals, contending that she cannot be liable for the illegal "gift" because she owed no fiduciary duty to the estate from which it came. She contends that she cannot be liable for the overcharges to the other estate because her co-representative was her boss and challenging his actions

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

might jeopardize her job. We reject Sietsema's first argument because the estate for which she was a personal representative was also the sole beneficiary of the estate from which the improper gift was drawn, so that accepting the gift prevented funds from reaching the estate that she represented. We reject her second argument because an estate's personal representative is not excused from her fiduciary duty to avoid diminution simply because fulfilling that duty might jeopardize her own interests. We therefore affirm.

## FACTS

Lois Wiggs and housemate Darlene Neuman each executed a will naming the other as the sole beneficiary and nominating the other as her personal representative. Both women died—Neuman in March 2008 and Wiggs in June 2008.

Neuman left behind an estate worth $115,274 including stock, bank accounts, two cars, and tangible personal property. After Neuman died, Wiggs met with Kelvin Miller, a 30-year acquaintance, who had offered to help handle the Neuman estate. Miller owns Primarius Promotion, an event-planning and promotions company for which Elizabeth Sietsema worked as office manager and bookkeeper.

Miller had prepared a document, which Wiggs signed during their meeting. The document appointed Primarius "(specifically Kelvin W. Miller or Elizabeth Sietsema) ... to act on [her] behalf in all matters related to [her] being named beneficiary of the estate of Darlene J. Neuman or other property to which [she] may be entitled." The document did not specify the fees that Primarius might charge.

In April and May 2008, Miller presented and Wiggs signed two short-form powers of attorney naming Miller and Sietsema as Wiggs's attorneys-in-fact. Also during May, Wiggs executed a codicil to her will nominating Miller and Sietsema as her estate's personal representatives.

Over the next two months, Miller or Sietsema performed various personal services for Wiggs, including running errands, shopping, paying bills, visiting Wiggs at the hospital, and consulting with her doctors. According to Sietsema, Wiggs was unable to perform these tasks on her own because she was "in a very vulnerable state," and she was "very distraught and in grief over the death of her friend." Primarius did not send the bills for these services to Wiggs, and she never saw them.

When Wiggs died on June 22, 2008, her estate was valued at $543,405, including the $460,000 Edina home she had jointly owned with Neuman, $5,840 in bank accounts, and $77,565 in personal property, $48,815 of which she received as beneficiary of the Neuman estate. The district court appointed Miller as the personal representative of the Neuman estate on July 16, 2008. A month later, it appointed Miller and Sietsema as the personal representatives of the Wiggs estate.

After Wiggs's death, Primarius, Sietsema and Miller billed their services through the Wiggs estate. They made arrangements for Wiggs's funeral and burial, prepared and ultimately sold the house, paid household bills, and administered an estate sale. In April 2009, Sietsema made partial distributions to two of Wiggs's three named beneficiaries: Friends of Animal Adoptions (Animal Ark) and Feline Rescue. The third beneficiary was Kitty Trust, a trust established for the benefit of Wiggs's cats. These three beneficiaries were to receive the entire estate, equally divided among the three of them. Partial distributions in the amount of $35,000 each were made to Animal Ark and Feline Res-

cue. A distribution was also made to the Kitty Trust, but the trust was later deemed invalid, and the remainder from that trust was to go to the University of Minnesota's women's golf team.

Neither Miller or Sietsema had experience as a conservator, attorney-in-fact, or personal representative, and Primarius did not operate in any of those services. Primarius billed its usual clients for promotional work at hourly rates ranging from $60 to $125. Miller's hourly rate was $125, and his annual salary was $150,000. Sietsema's hourly rate was $85, and her annual salary was $90,000. As attorneys-in-fact and personal representatives, Miller and Sietsema directed all of Wiggs's personal-services work to Primarius, and Primarius billed the Wiggs estate for those services at the same rates it billed its usual clients for promotional work. They never explored lower-cost options for more competitive rates on behalf of the estate, and they did not explore whether their hourly rates were reasonable for personal representative services.

Miller and Sietsema did not separate the charges for the Neuman and Wiggs estates. The Wiggs estate was billed the following amounts for services allegedly rendered: $7,678 in May 2008, $13,110 in June, $14,554 in July, $11,478 in August, $8,403 and $5,657 in September, and $24,729 in October. The charges continued through fall 2009. Primarius billed the Wiggs estate a total of $163,593 for 1,550 hours of work. The invoices did not describe the work done; they showed only the amount of time allegedly spent. Sietsema, acting as co-representative of the Wiggs estate, paid Primarius's invoices. Miller paid Sietsema and himself personal representative fees from the estate funds. These fees were in addition to the hourly amounts for services that Pri-

marius charged the estate for Miller's and Sietsema's work.

In June 2008, Miller gave Sietsema $5,000 on behalf of the Neuman estate. He also paid her $7,500 and $9,000 charged to the Wiggs estate, later asserting that this was for services that had not been accounted for in the hourly billing of Sietsema's time. Miller paid himself for what he called personal representative fees of $50,000 for the Wiggs estate and $26,500 for the Neuman estate. Miller alone determined the amount of the personal representative fees.

Miller also lent himself money from the Wiggs estate. He borrowed a total of $72,019 from the checking account and $15,000 from the Kitty Trust, and, at his direction, Primarius borrowed $19,000 from the estate. Sietsema was aware that Miller did this, recording the withdrawals in the estate's bank records. She later testified that she objected to the loans, but she kept her objections private; she did nothing to stop them or to notify the court or any of the beneficiaries about them.

In November 2009, Miller filed a final accounting for the Neuman estate and he and Sietsema filed an inventory for the Wiggs estate. The beneficiaries objected successfully. The district court ordered that the estates' administrations be supervised proceedings and that the representatives post bonds. The University of Minnesota petitioned the district court for an order restraining the personal representatives and requiring Miller and Sietsema to deposit the estates' funds with the court. Miller and Sietsema failed to post a bond. The district court first restrained them from acting in either estate and suspended their powers, and then it removed them altogether, appointing Terrence McCool to serve as a personal representative of both estates.

The district court ordered Miller and Sietsema to submit a final accounting of the Wiggs estate. They did so, and both Animal Ark and the University of Minnesota objected to their accounting and sought surcharges against Miller and Sietsema.

The district court held a bench trial in May 2011. McCool testified that experienced professional fiduciaries in the Twin Cities typically charge $50 to $75 per hour and that those with little or no experience should charge significantly less, around $30. He also testified that persons can be retained for $17 to $25 hourly to run errands, do bookkeeping, and clean.

The district court found that Miller and Primarius claimed fees totaling $99,958 for the Neuman estate and Miller and Sietsema claimed fees totaling $189,081 for the Wiggs estate.[1] It determined that a reasonable rate for the services provided by Primarius would have been $25 per hour. And it found that the 1,550 hours Primarius billed for its services for both estates was overstated and that the work should have taken 400 hours. The district court held that Miller and Sietsema breached their fiduciary duties with respect to the administration of both estates for charging at excessive billing rates, engaging in conflicts of interest, and double billing. It found that they used less than reasonable care when they paid themselves personal representative fees in addition to the fees paid to Primarius, engaged in self-dealing, failed to retain proper reasonably priced providers of administrative services, provided substandard accounting, and borrowed estate funds for personal use.

After adjusting for the excesses, the district court ordered Miller to repay the Neuman estate $38,628 for excess payments to Primarius and to repay the Wiggs estate $19,373 for excess payments to Primarius for work done for Wiggs personally. It held Miller and Sietsema jointly and severally liable to the Wiggs estate for $108,519 for excess payments to Primarius for work done on the Wiggs estate. It ordered Miller to repay the Neuman estate $30,000 for unearned personal-representative fees. And it held Miller and Sietsema jointly and severally liable to the Neuman estate for $5,000 for the alleged gift and also for the $43,000 in unearned personal-representative fees.

Sietsema appeals.

## ISSUES

I. Did the district court err by holding Sietsema jointly and severally liable for the $5,000 payment she received from the Neuman estate?

II. Did the district court err by holding Sietsema jointly and severally liable for the $151,519 in excess charges for personal services and personal-representative fees on the Wiggs estate?

## ANALYSIS

 Sietsema challenges the district court's order holding her jointly and severally liable with Miller for losses to the Neuman and Wiggs estates. We review a district court's probate decision to determine whether its findings are clearly erroneous and whether it erred in its legal conclusions. *In re Estate of Simpkins*, 446 N.W.2d 188, 190 (Minn.App.1989). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made.

1. The district court stated that the claimed fees for the Wiggs estate accounted for 85% of the Wiggs estate assets. This appears to be a typo, as the claimed fees accounted for about 35% of the Wiggs estate assets.

*In re Estate of Langlie,* 355 N.W.2d 732, 735 (Minn.App.1984). We are convinced that the district court did not err by holding Sietsema jointly liable for the damages here.

**I**

■ The district court properly held Sietsema jointly and severally liable for the $5,000 payment that Miller transferred to her from the Neuman estate. Persons are jointly and severally liable if "two or more persons . . . act in a common scheme or plan that results in injury." Minn.Stat. § 604.02, subd. 1(2) (2010).

The district court found that the $5,000 payment Miller made to Sietsema from the Neuman estate was a gratuitous payment that did not represent any work performed or benefit to the estate. That fact is not disputed.

Sietsema contends that because she was not a personal representative of the Neuman estate, she owed that estate no fiduciary duty and is therefore not liable for its $5,000 loss. She correctly argues that personal representatives are generally solely liable as fiduciaries: "If the exercise of power concerning the estate is improper, *the personal representative is liable* to interested persons for damage or loss resulting from breach of fiduciary duty to the same extent as a trustee of an express trust." Minn.Stat. § 524.3–712 (2010) (emphasis added). But this does not end the analysis.

This representative-liability statute does not purport to excuse from compensatory repayment someone like Sietsema, who knowingly received funds from an estate having no reason to believe they were properly given and every reason to suspect they were not. In any event, in this case Sietsema was the personal representative of the Wiggs estate, and she clearly owed that estate a fiduciary duty. The $5,000 that Sietsema pocketed from the Neuman estate was destined for the Wiggs estate, since the Wiggs estate was the sole beneficiary. So by retaining the money, Sietsema breached her fiduciary duty to the Wiggs estate, and the district court can remedy that breach by ordering Sietsema to repay the rightful end recipients of the converted funds.

We add that Sietsema can find no solace in section 524.3–714(a) (2010), which protects those who deal above-board with personal representatives: "A person who in good faith either assists a personal representative or deals with the personal representative for value is protected as if the personal representative properly exercised power." Sietsema certainly does not qualify for this statutory protection, which is reserved for those who have acted in good faith or who provided value in dealing with the personal representative. Sietsema provided nothing of value to the estate in exchange for the $5,000, and she cannot be said to have acted in good faith under these circumstances. She knew that Miller was the personal representative of Neuman's estate, that she was not a beneficiary of the estate, and that the money was not for any services she had performed.

■ The beneficiaries of the Wiggs estate also argue that equity requires that Sietsema be ordered to repay the $5,000 because she has been unjustly enriched. To prove unjust enrichment, a claimant must show that the defendant has knowingly received something of value in the nature of an unjust or unlawful action, not being entitled to it and under circumstances that would make it unjust to permit her to retain it. *First Nat'l Bank of St. Paul v. Ramier,* 311 N.W.2d 502, 504 (Minn.1981); *Southtown Plumbing, Inc. v. Har–Ned Lumber Co.,* 493 N.W.2d 137,

140 (Minn.App.1992). The unjust-enrichment theory also supports the district court's decision. Sietsema accepted the $5,000 knowing she was already compensated through Primarius for any work she performed for the Neuman estate. That Miller later claimed that he thought that Wiggs would have wanted Sietsema to have the funds does not justify Sietsema's retention of the funds given the scheming circumstances in this case. As Sietsema's attorney conceded at oral argument, no equitable reasons support Sietsema's quest to retain the $5,000.

## II

■ The district court also properly held Sietsema jointly and severally liable for the $151,519 to the Wiggs estate, representing $43,000 in excessive personal-representative fees and $108,519 in excessive payments to Primarius for personal services. A personal representative owes a fiduciary duty to the estate. Minn.Stat. § 524.3–703(a) (2010). As such, the personal representative must manage the estate's assets under the level of care of "a prudent person dealing with the property of another." *Id.* This requires her to settle and distribute the estate according to the testator's will and in the best interests of the estate. *Id.*

Sietsema does not dispute that, as one of the personal representatives of the Wiggs estate, she owed the estate a fiduciary duty. But she contends that she ought to be held to some standard below the prudent-person standard because Miller, who was the other personal representative of that estate, had the real authority over the improper decisions because he made them in the context of his role as Sietsema's employer, and Sietsema was subject to potential termination from employment if she did anything more than object to those decisions. The argument depends on an implied premise that a fiduciary must prudently protect the funds entrusted to her only if prudence is in her own best interests, and, if it is not, she is free to look out for herself. The argument has two fundamental flaws.

■ The first flaw in the argument is that it rests on a fiction. An employee who is a co-personal representative with her employer is protected by law from the kind of adverse employment action that Sietsema speculates about. The common-law claim of wrongful discharge is available to employees discharged for refusing to violate the law. *See Phipps v. Clark Oil & Ref. Corp.,* 408 N.W.2d 569, 571–72 (Minn.1987); *see also Nelson v. Productive Alts., Inc.,* 715 N.W.2d 452, 457 n. 5 (Minn. 2006) (recognizing continued vitality of Minnesota's common-law claim of wrongful discharge). Sietsema's argument depends on her fear of a harm for which the law already provides a remedy.

■ The second flaw in the argument is that it mistakenly supposes that a fiduciary may act in the fiduciary's own interests against the estate's interests. That a fiduciary may be primarily self-interested rather than estate-interested defies the essence of a fiduciary relationship. We have said that a "[f]iduciary duty is the highest standard of duty implied by law." *D.A.B. v. Brown,* 570 N.W.2d 168, 172 (Minn.App. 1997). Of course a fiduciary has the duty to avoid conflicts of interest with the estate. *In re Estate of Michaelson,* 383 N.W.2d 353, 355–56 (Minn.App.1986) (affirming removal of estate's personal representative who had "a conflict of interest with the general interests of the estate"). The idea that a fiduciary should avoid conflicting engagements presupposes that some degree of personal sacrifice attaches to the duty. Under this high standard, we see no reason to hold Sietsema to a lesser duty of care once she failed to avoid the

conflict between her desire to maintain her employment with Miller and her obligation to protect the estate's assets from Miller's actions. Put another way, faced with the choice between one's own pecuniary interests and the interests of the entity to whom she owes a fiduciary duty, a fiduciary must eschew the self-dealing, entity-injuring option.

Sietsema relies on *Southern Surety Co. v. Tessum* to support her argument that she should not be held jointly and severally liable for Miller's actions because she had no control over his decisions and could not question them. Her reliance on *Tessum* is misplaced; that case actually defeats her argument. In *Tessum*, two brothers were co-trustees of their mother's trust when one of them embezzled trust funds while the other was out of town. 178 Minn. 495, 498, 228 N.W. 326, 328 (1929). The supreme court acknowledged the rule that, "as between the trustees themselves, the loss may be thrown upon the party on whom, as the recipient of the money or otherwise, the responsibility ought in equity to fall." *Id.* at 501, 228 N.W. at 329 (quotation omitted). So it is true, as Sietsema points out, that "as between themselves" the brother at primary fault in *Tessum* was obligated to indemnify the other. *Id.* at 501–02, 228 N.W. at 329. But, undermining Sietsema's argument, the *Tessum* court also clarified that, "*as to the ward,* [both brothers] were *joint* tortfeasors" as co-trustees who each owed the ward a fiduciary duty. *Id.* (emphasis added). Just as the non-embezzling brother in *Tessum* was liable to the injured beneficiary, Sietsema is liable to the beneficiaries of the Wiggs estate because she was a consenting party in the improper payments made from the estate. And unlike the non-embezzling brother in *Tessum*, Sietsema was directly involved with the improper payments because she knew they were being made but did nothing to prevent them.

Sietsema argues that, as a matter of public policy, our holding a personal representative liable for the improper acts of her co-representative without regard to an imbalanced power relationship between them would have a chilling effect on a person's willingness to serve as representative. She may be correct; if a candidate for personal representative foresees that she cannot meet her fiduciary obligations to the estate because meeting those obligations might offend her employer, she should decline service as personal representative. But we don't see how this offends public policy.

■ A personal representative "is under a duty to see that the assets constituting the testator's estate are not diverted from the course prescribed by the testator." *In re Estate of Schroeder*, 441 N.W.2d 527, 530 (Minn.App.1989), *review denied* (Minn. Aug. 15, 1989) (quotation omitted). Seitsema was found by the district court to have failed in this duty and we are not persuaded by her arguments that some lesser duty applies to her. If a personal representative breaches her fiduciary duty, she "is liable to interested persons for damage or loss resulting from [the breach] to the same extent as a trustee of an express trust." Minn.Stat. § 524.3–712. And two or more individuals are jointly and severally liable if they "act in a common scheme or plan that results in injury." Minn.Stat. § 604.02. We are satisfied that the district court did not err by holding Sietsema jointly and severally liable for the $151,519 in excess charges for personal services and personal-representative fees charged to the Wiggs estate.

## DECISION

The district court did not err by holding Sietsema jointly and severally liable with

Miller for the $5,000 payment Sietsema received from the Neuman estate. The district court also did not err by holding her jointly and severally liable with Miller for the excessive payments made from the Wiggs estate.

**Affirmed.**